

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00041-CR

_____

TANIA VELAZQUEZ, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 6
Tarrant County, Texas
Trial Court No. 1680049

---

Before Kerr, Birdwell, and Walker, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant Tania Velazquez was arrested and charged with driving while intoxicated. After the trial court denied Velazquez's pretrial motion to suppress evidence from her detention and arrest, she pleaded guilty pursuant to a plea agreement. The trial court adjudged Velazquez guilty and assessed her punishment at 90 days in jail, probated for 15 months, and a $500 fine. Velazquez appeals from her conviction, arguing in two issues that the trial court erred by denying her motion to suppress. We will affirm.

## I. Background

At 3:23 a.m. on January 25, 2021, an employee at a Whataburger in Grand Prairie called 911 to report that a vehicle had been sitting in the restaurant's drive-through for about 20 minutes. The caller thought that the driver was asleep. Officer James Kaman—a certified Texas peace officer and a patrol officer with the Grand Prairie Police Department—was dispatched to the restaurant for a "check welfare" call.

When Officer Kaman arrived at the restaurant at about 3:34 a.m., he saw a vehicle parked at the drive-through's entrance. The vehicle was not "necessarily blocking the entire entrance," but Officer Kaman saw cars having to drive around the vehicle to access the drive-through.

The keys were in the vehicle's ignition, the engine was running, and the windshield wipers were on. The vehicle appeared to be in park. The driver's seat was

reclined, and the driver—Velazquez—was passed out or asleep with her head back and mouth open. Before attempting to wake Velazquez, Officer Kaman opened the driver's side door, turned off the car, and removed the keys from the vehicle's ignition.

Officer Kaman then started tapping Velazquez's elbow and shining his flashlight in her eyes. It took Officer Kaman about 20 seconds to wake her up. Once she was awake, Officer Kaman identified himself as law enforcement and asked her if she was "okay" to find out why she was passed out or asleep. Officer Kaman thought that Velazquez was a "little bit" disoriented and confused about the situation. He could see that Velazquez's eyes were bloodshot and watery, and he smelled alcohol coming from Velazquez.

At that point, Officer Kaman suspected that Velazquez was intoxicated and that her intoxication was the reason that she was passed out in her vehicle. Officer Kaman asked Velazquez for identification, and while she was looking for it in her purse, he asked her if she knew where she was. Velazquez thought she was in Richardson, a city about 30 minutes northeast of Grand Prairie. Velazquez struggled to find her identification card, but Officer Kaman could see it in her purse. After she gave him permission to help her look for it, he was able to quickly locate it and pull it out of her purse.

Velazquez admitted that she had been at a bar in Arlington. When Officer Kaman asked how much she'd had to drink at the bar, she admitted she had consumed three beers and two shots.

Officer Kaman then asked Velazquez if she would cooperate in performing standardized field sobriety tests (SFSTs), and Velazquez agreed. Officer Kaman—who is NHTSA[1] certified in SFSTs—conducted three SFSTs: the horizontal-gaze-nystagmus (HGN) test, the walk-and-turn test, and the one-leg-stand test. Velazquez failed all three of them.

Based on the totality of the circumstances—Velazquez's admissions that she had been at a bar and had been drinking; her watery, bloodshot eyes; the smell of alcohol on her breath; her parked car partially blocking drive-through traffic in the Whataburger parking lot; and her failing the SFSTs—Officer Kaman believed that he had probable cause to arrest Velazquez for driving while intoxicated and for a warrant to draw her blood. Officer Kaman then placed Velazquez under arrest, and she consented to a blood draw.

The State charged Velazquez with driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04(a), (b). She moved under Article 38.23 of the Texas Code of Criminal Procedure to suppress any evidence from her detention and arrest, arguing that Officer Kaman's stop was not justified under the community-caretaking

---

[1]NHTSA is an acronym for the National Highway Traffic Safety Administration.

exception to the Fourth Amendment and that Officer Kaman lacked reasonable suspicion to detain her. She further argued that Officer Kaman had arrested her without probable cause, which violated her Fourth Amendment right to be free from unlawful searches and seizures. Finally, Velazquez argued that her consent to the blood draw was involuntary because her detention and arrest were unlawful.

At the hearing on Velazquez's suppression motion, Officer Kaman testified. His report, footage from his body camera, and the 911-call recording[2] were admitted into evidence. At the hearing's conclusion, the trial court denied the suppression motion.

Velazquez reserved her right to appeal the trial court's ruling on her suppression motion and pleaded guilty pursuant to a plea agreement. After her conviction, Velazquez timely appealed. In two issues, she challenges the trial court's denial of her suppression motion: (1) the trial court erred in determining that Officer Kaman had exercised the community-caretaking function and (2) the trial court erred in concluding that Officer Kaman had probable cause to arrest Velazquez and to draw her blood without a warrant.

## II. Standard of Review

We apply a bifurcated standard of review to a trial court's ruling on a motion to suppress evidence. *State v. Martinez,* 570 S.W.3d 278, 281 (Tex. Crim. App. 2019).

---

[2]According to Officer Kaman, the 911 recording was consistent with the facts he received from dispatch that night.

Because the trial judge is the sole trier of fact and judge of the witnesses' credibility and the weight to be given their testimony, *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007), we defer almost totally to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on evaluating credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor, *Martinez*, 570 S.W.3d at 281. Whether the totality of circumstances supports reasonable suspicion or probable cause is a legal determination we review de novo. *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008).

When, as here, the record is silent on the reasons for the trial court's ruling and there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we infer the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

### III. Applicable Law

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. A defendant

6

seeking to suppress evidence on Fourth Amendment grounds bears the initial burden to produce some evidence that the government conducted a warrantless search or seizure that he has standing to contest. *Rawlings v. Kentucky*, 448 U.S. 98, 104–05, 100 S. Ct. 2556, 2561 (1980); *State v. Martinez*, 569 S.W.3d 621, 623 (Tex. Crim. App. 2019). Once the defendant does so, the burden shifts to the State to prove either that the search or seizure was conducted pursuant to a warrant or, if warrantless, was otherwise reasonable. *Martinez*, 569 S.W.3d at 623. Here, Velazquez was not seized pursuant to a warrant, so the State had the burden to show that her detention and arrest were reasonable under the applicable standards.

## IV. Velazquez's Detention

Velazquez argues in her first issue that the trial court erred by denying her suppression motion because her detention did not fall within the community-caretaking exception to the Fourth Amendment, contending that the exception does not apply because Officer Kaman's exercise of the community-caretaking function was pretextual. She further contends that absent the exception, Officer Kaman lacked specific, articulable facts providing reasonable suspicion to detain her.

A detention may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021). An officer conducts a lawful temporary detention when he reasonably suspects that an individual is violating the law. *See Johnson*, 622 S.W.3d at

7

384. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id.* This is an objective standard that disregards the detaining officer's subjective intent and looks solely to whether the officer has an objective basis for the stop. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 36 (Tex. Crim. App. 2017).

But even without reasonable suspicion or probable cause that an offense had been committed, a police officer may reasonably seize an individual in accordance with his community-caretaking function. *Corbin v. State*, 85 S.W.3d 272, 276 (Tex. Crim. App. 2002). The community-caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 277 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973)). Rather, the exception concerns such police functions as assisting individuals who cannot care for themselves or who are in danger of physical harm, resolving conflicts, and reducing the opportunities for commission of crime. *Laney v. State*, 117 S.W.3d 854, 860 (Tex. Crim. App. 2003); *see Wright v. State*, 7 S.W.3d 148, 151 (Tex. Crim. App. 1999) ("As part of his duty to 'serve and protect,' a police officer may stop and assist an individual whom a reasonable person—given the totality of the circumstances—would believe is in need of help."). This function may be invoked to justify a detention if (1) the officer was primarily and subjectively

motivated by a community-caretaking purpose and (2) the officer's belief that the individual needed help was objectively reasonable. *Gonzales v. State*, 369 S.W.3d 851, 854–55 (Tex. Crim. App. 2012).

Here, Velazquez concedes that "[a]s the exclusive judge of credibility and finder of fact, the trial court could have concluded Officer Kaman was primarily motivated by community[-]caretaking concerns." We thus must determine only whether the evidence supports a conclusion that Officer Kaman's belief that Velazquez needed help was objectively reasonable. *See id.* To make this determination, we consider the following nonexclusive factors: (1) the nature and level of the distress exhibited by Velazquez, (2) Velazquez's location, (3) whether or not Velazquez was alone or had access to assistance other than that offered by the officer, and (4) to what extent Velazquez, if not assisted, presented a danger to herself or others. *See id.* at 855; *Wright*, 7 S.W.3d at 151–52.

Velazquez argues that considering these factors, Officer Kaman's belief that she needed help was not objectively reasonable. Regarding the first factor, Velazquez points out that Officer Kaman testified at the suppression hearing that he did not see any signs of a medical emergency, injury, or distress when he arrived on scene. Although he asked Velazquez if she was okay, he admittedly did not ask her any questions about whether she had suffered a medical emergency, whether she had been injured, or whether she was in pain. Instead, he asked her whether she had been drinking. Velazquez "submit[s] that merely sleeping in a parked vehicle reflects that

9

the first factor—the nature and level of distress exhibited, which carries the most weight—was practically nonexistent."

We disagree. "[C]ourts have never required an officer to know, with any degree of certainty, the specific distress an individual may be suffering," and an officer is entitled to make inferences from the information he has in determining whether a person needs assistance. *Gonzales*, 369 S.W.3d at 856. An officer who either observes a person asleep or unconscious in a parked vehicle or receives a report of such a situation has an objectively reasonable basis for believing that the person is in distress and needs help. *See, e.g.*, *Ramirez v. State*, No. 08-19-00097-CR, 2021 WL 3260630, at *5 (Tex. App.—El Paso July 30, 2021, pet. ref'd) (not designated for publication) (concluding that officer who had been "informed by dispatch that a 911 caller had seen an individual in a vehicle matching the description of Appellant's truck 'slumped down' in the vehicle at a stop sign, raising the possibility that the individual may have fallen asleep, fainted, or had suffered an 'attack' of some kind" supported first factor weighing in favor of detention); *Windham v. State*, No. 04-13-00284-CR, 2014 WL 769333, at *3 (Tex. App.—San Antonio Feb. 26, 2014, no pet.) (mem. op., not designated for publication) ("There is no question that responding to a report of an unresponsive person in a parked car, regardless of its location, falls within a police officer's community[-]caretaking function."); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 7.4(f) (6th ed. 2022) ("If the police find a person unconscious or disoriented and incoherent in a vehicle . . . , it is reasonable for them to enter the vehicle for the

purpose of giving aid to the person in distress and of finding information bearing upon the cause of his condition.").

Here, Officer Kaman was dispatched on a check-welfare call in response to a 911 call regarding a vehicle that had been sitting in the Whataburger drive-through for about 20 minutes because the driver may have been asleep. When Officer Kaman arrived, he saw Velazquez reclined in her parked and running vehicle's driver's seat. She was passed out or asleep with her head back and mouth open. And although Officer Kaman ultimately determined that Velazquez was not in any distress but was instead under the influence of alcohol, that does not mean that his initial belief that she was in distress was not objectively reasonable. *See Ramirez*, 2021 WL 3260630, at *6. Accordingly, we conclude that the first factor supports a finding that Officer Kaman's belief that Velazquez needed help was objectively reasonable.

Regarding the second and third factors—Velazquez's location and whether or not Velazquez was alone or had access to assistance other than that offered by the officer—Velazquez argues that she was in a parking lot of an open Whataburger that was fully staffed with employees.[3] Although the State does not dispute that the

---

[3]Velazquez asks us to take judicial notice that "all *real* Texans know Whataburger is open 24 hours a day." While tempting, it is impossible for us to judicially notice what all real Texans know, and we are uncertain whether all Whataburger restaurants are, in fact, open 24 hours. *See* Tex. R. Evid. 201. In any event, it is unnecessary for us to do so because after reviewing the evidence, it is apparent that the Whataburger where this incident occurred was open at the time that Velazquez was detained and arrested.

Whataburger was open, it points out that Velazquez's vehicle was not parked in a designated parking spot but was idling in the parking lot in a location that required other vehicles to drive around it to access the drive-through. The State further points out that Velazquez was unresponsive and alone in her vehicle and that aside from a customer's notifying a Whataburger employee about Velazquez and a Whataburger employee calling 911 for police assistance, no one else had attempted to assist Velazquez. Although alone in her vehicle, Velazquez was not in an isolated area and had access to an open restaurant if she needed assistance. We conclude that these two factors weigh against detention. *See King v. State*, No. 05-13-00178-CR, 2014 WL 2807993, at *4 (Tex. App.—Dallas June 18, 2014, no pet.) (mem. op., not designated for publication).

As to the fourth factor—the extent to which Velazquez was a danger to herself or others—Velazquez asserts that she "was just minding her own business, asleep in her car, and . . . no evidence was adduced at the pretrial hearing reflecting that [she] presented a danger to herself or anyone else while merely sleeping." We disagree. Velazquez's vehicle was not parked in a parking space but was parked at the drive-through's entrance and was partially blocking drive-through traffic so that cars had to drive around it to access the drive-through. Before attempting to wake Velazquez, Officer Kaman turned off the car and removed the keys from the vehicle's ignition because, in his experience, when you wake a driver up, "their natural startled response is to put the car in drive or put their foot on the accelerator and take off." If

12

Velazquez had been startled awake and suddenly driven off, she could have injured herself or others. *See id.* at \*5. We thus conclude that the fourth factor weighs in favor of detention.

Accordingly, viewing the evidence in the light most favorable to the trial court's ruling and considering the totality of the circumstances, we conclude that the evidence supports the trial court's conclusions that Officer Kaman's subjective belief that Velazquez needed help was objectively reasonable and that Velazquez's detention was thus justified under the community-caretaking exception. *See, e.g.*, *Windham*, 2014 WL 769333, at \*1, \*3 (holding that officer responding to report of an unresponsive person in the driver's seat of a car parked with its engine off in a parking lot next door to county emergency-medical-services building fell within police officer's community-caretaking function); *King*, 2014 WL 2807993, at \*4–5 (concluding that officer had an objectively reasonable belief that individual needed assistance when he saw the individual asleep or passed out in the driver's seat of a running car with four flat tires parked in an open gas station's parking lot); *Rochester v. State*, No. 2-03-519-CR, 2004 WL 1798090, at \*1 (Tex. App.—Fort Worth Aug. 12, 2004, no pet.) (per curiam) (mem. op., not designated for publication) (concluding that officer reasonably exercised his community-caretaking functions when he woke a driver who was alone and unconscious in a vehicle near a busy thoroughfare). We therefore need not address Velazquez's reasonable-suspicion argument. *See* Tex. R. App. P. 47.1.

13

We overrule Velazquez's first issue.

## V. Velazquez's Arrest

Velazquez's second issue challenges her arrest. She argues that the trial court erred by concluding that Officer Kaman had probable cause to arrest her and to draw her blood without a warrant.

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). A police officer may arrest an individual without a warrant only if probable cause exists with respect to that individual and the arrest falls within one of the exceptions set out in the code of criminal procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.03, 14.04.

To have probable cause for a warrantless arrest, an officer must reasonably believe, based on facts and circumstances within the officer's personal knowledge— whether through direct observation, from reasonably trustworthy information, or both—that a person has committed or is committing an offense. *State v. Woodard*, 341 S.W.3d 404, 412 (Tex. Crim. App. 2011); *Torres*, 182 S.W.3d at 901–02. The officer must base probable cause on specific, articulable facts rather than the officer's mere opinion. *Torres*, 182 S.W.3d at 902. We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Id.*

Velazquez's argument attacks Officer Kaman's administration of the SFSTs. She argues that at the time Officer Kaman administered those tests, he "failed to ask Velazquez whether she had taken any medication, whether she had suffered any sort of head injury, whether she suffered from epilepsy, and whether she had any other sort of medical conditions." According to Velazquez, if she had answered affirmatively to these inquires, the value of the SFSTs would have been negated, and because Officer Kaman "did not adequately eliminate possible conditions that would have yielded a false positive on Velazquez's SFSTs, he failed to develop probable cause during his detention of Velazquez."

Officer Kaman testified that he was trained to look for "signs" that might result in "a false positive on [the] HGN," such as medications and medical issues. Before conducting the SFSTs, Officer Kaman confirmed that Velazquez did not have epilepsy, an inner-ear infection, diabetes, any type of head trauma, or anything "physical," though he did not specifically ask Velazquez whether she had taken any medication. Officer Kaman testified that he observed all six clues on the HGN test, four clues on the walk-and-turn test, and two clues on the one-leg-stand test. In addition to Officer Kaman's testimony about administering the SFSTs, his body-camera recording, which included footage of him administering those tests, was played for the trial court.

Velazquez's challenge here to Officer Kaman's administration of the SFSTs goes to the weight of the tests, not their admissibility or reliability. *See McRae v. State*,

15

152 S.W.3d 739, 743 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (op. on reh'g); *see also Bryant v. State*, No. 2-08-294-CR, 2010 WL 2813494, at \*5 (Tex. App.—Fort Worth July 15, 2010, no pet.) (not designated for publication); *Sykora v. State*, No. 09-05-171-CR, 2006 WL 439005, at \*4 (Tex. App.—Beaumont Feb. 22, 2006, no pet.) (mem. op., not designated for publication). Viewing the evidence in the light most favorable to the trial court's ruling and considering the totality of the circumstances—including Velazquez's being asleep in her parked car, which was partially blocking a drive-through; her admissions that she had been at a bar and had been drinking; her watery, bloodshot eyes; the smell of alcohol on her breath; and the SFSTs—we conclude that the evidence supports the trial court's conclusion that Officer Kaman had probable cause to arrest Velazquez for driving while intoxicated.

We overrule Velazquez's second issue.

## VI. Conclusion

Having overruled Velazquez's two issues, we conclude that the trial court did not err by denying Velazquez's suppression motion, and we therefore affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  February 9, 2023